**MIDWEST MATERIALS COMPANY, Plaintiff–Respondent,**

v.

**VILLAGE DEVELOPMENT COMPANY, Theodore Ruppert, and R. Michael Webb, Defendants–Appellants.**

No. 16673.

Missouri Court of Appeals, Southern District, Division Two.

March 29, 1991.

Nicholas J. Lamb, Thompson & Mitchell, St. Louis, for defendants-appellants.

Leland C. Bussell, JoAnne Spears Jackson Bussell, Hough, O'Neal & Hall, Springfield, for plaintiff-respondent.

SHRUM, Judge.

In this breach of contract case, a jury awarded damages of $34,933.50 and interest of $27,972.69 to respondent Midwest Materials Company, the contractor, on its claim under a building construction contract. The jury found against appellant Village Development Company, the owner, on its counterclaim for breach of contract. The trial court entered judgment pursuant to the jury verdict and Village has appealed. We affirm.

## FACTUAL AND PROCEDURAL SYNOPSIS

In December 1981, the parties entered a contract under which Midwest, a corporation, would build a condominium apartment complex at the Lake of the Ozarks for Village, a partnership consisting of appellants Theodore Ruppert and R. Michael Webb. Within one year, disputes arose about various matters such as costs incurred, quality of the work, changes in specifications, timeliness of completion, and payment by the owner to the contractor. Midwest ceased work on the project prior to completion of the entire complex.

In early 1984, Midwest filed a petition whereby it sought to enforce a previously filed mechanics lien. In its petition, Midwest also alleged Village had breached the contract in that it "terminated said contract before completion and ceased making the payments required therein to [Midwest]." In its counterclaim, Village alleged that Midwest had breached the contract by failing to substantially complete the first two phases of the project on time, by failing to perform its duties in a "skilled and workmanlike manner," by completing two phases of the four-phase $776,703.00 project at a cost of $501,000.00, and by charging Village for costs that were not to be reimbursed under the contract. Village sought damages totaling $400,000.00.

In May 1986, the case was transferred to the circuit court's inactive docket pursuant to local rule. The docket sheet reflects that in May 1987 the case was "closed as per local court rule." In September 1987, the trial court reinstated the lawsuit to the active docket.

In January 1989 the trial court granted summary judgment to Village on the mechanics lien enforcement claim, and the suit went to trial in October 1989 on the parties'

breach of contract claims. After a four-day trial, the jury returned verdicts for Midwest on its claim and Village's counterclaim. Following a hearing, the trial court denied Village's motions for a new trial and judgment notwithstanding the verdict. Village now appeals. We will set out additional facts as necessary in the course of our discussion of Village's nine points on appeal.

## ISSUES ON APPEAL

In summary fashion, this appeal presents the following issues.

1. Whether the trial court erroneously concluded this lawsuit had not been dismissed for lack of prosecution pursuant to a local court rule and whether the trial court exceeded its jurisdiction in reinstating this case from the inactive to the active docket.

2. Whether Midwest made a submissible case on its breach of contract claim.

3. Whether Village was entitled to a judgment on its counterclaim as a matter of law.

4. Whether the trial court committed prejudicial error in overruling Village's objection to Midwest's closing argument to the jury.

5. Whether the trial court improperly instructed the jury in submitting the verdict director on Village's counterclaim.

6. Whether the trial court committed prejudicial error when it permitted introduction of evidence, over objection, that Village owed money to the project architect.

7. Whether the trial court committed prejudicial error when it permitted introduction of evidence pertaining to increases in the cost of the work.

8. Whether the trial court committed prejudicial error when it refused to admit exhibits which Village claimed were probative of damages.

9. Whether Village was entitled to a new trial because a juror, in her juror questionnaire and on voir dire, did not fully disclose her involvement in prior lawsuits.

## ISSUE ONE: DISMISSAL UNDER LOCAL RULES

Midwest filed its original petition in January, 1984. The lawsuit proceeded through various stages of pleading and discovery until May 15, 1986, when the following docket entry was made. "Case placed on Inactive Docket, Atty's notified." The transfer to the inactive docket was based on local Circuit Court Rule 8.2 which states, in part:

> The circuit clerk shall maintain two civil dockets for the cases filed with them: (1) ACTIVE and (2) INACTIVE. Upon filing, a case shall be included on the active docket. Cases not disposed of during two (2) years next following their filing shall, on the first day of the term of court next following expiration of said two (2) year period, be deleted from the active docket and placed on the inactive docket. *Attorneys of record in cases placed on the inactive docket shall be notified by the circuit clerk of the transfer of cases to the inactive docket within thirty (30) days next following such transfer.* (Emphasis added.)

Local court Rule 8.2 also provides that if a case is not reinstated to the active docket by court order, upon request by a party, within one year, the case shall then be dismissed, "without prejudice and without further notice to any party thereto, for lack of prosecution." A related provision, local Rule 37.2 provides, in pertinent part:

> Once a case is placed on the inactive docket established by Rule 8.2 hereof, that case may be reinstated to the active docket *only* in the manner prescribed by Rule 8.2. *Once such a case is dismissed for lack of prosecution pursuant to Rule 8.2, that case is not subject to reinstatement absent being refiled as a new case.* Rule 8.2 shall be *strictly enforced* and all counsel are advised to carefully review and consider its content. (Emphasis added.)

In the trial court file is a copy of a form letter dated May 15, 1986, completed so as to state that the case had been placed on the inactive docket "on 5–5–86...." As

the trial court later noted in its order reinstating the case, the letter was "not addressed in the manner customary for business correspondence"; rather, at the bottom of the letter, the following appeared:

c.c. Leland C. Bussell, c.c. Sam Weber, c.c. Lewis Z. Bridges, c.c. Charles E. McElyea, c.c. Nicholas J. Lamb, c.c. Marshall K. and Mrs. Shirley J. Fisk.

The next entry on the docket sheet reads: "5/19/87: Case closed as per local Court rule." On August 21, 1987, Midwest's attorneys moved to reinstate the case, swearing that they had never received notice from any source that the case had been transferred to the inactive docket. In opposition to Midwest's motion, Village filed affidavits of Charles McElyea and Lewis Bridges, both attorneys of record in the case, and Marshall Fisk, a named defendant in Midwest's claim, in which each person swore he had received the May 15, 1986, notice about the case being placed on the inactive docket.

On September 14, 1987, the trial court sustained Midwest's motion to reinstate the case to the active docket. In its memorandum and order, the trial court pointed out that the local rules were "silent as to how notice is to be given by the clerk" and that they did not provide "that the mailing of

notice will constitute its being given to the addressee ...," and they did not require all counsel "to inquire as to the status of a case after a prescribed time...."

Although the trial court found "no indication but that the clerk attempted to do his duty by mailing the prescribed notice," it concluded, based on the verified motion filed by Midwest's attorneys, that "the attorneys for plaintiff were not notified by the circuit clerk of the transfer of the case to the inactive docket at the requisite time or at any other time." For those stated reasons, the trial court concluded that the case was not validly placed on the inactive docket and, therefore, "was not dismissed for lack of prosecution...."

In this first point on appeal, Village contends the trial court, in reinstating the case to the active docket, violated its own rules and exceeded its jurisdiction.[1] In the argument under this point, Village additionally claims the trial court "unreasonably accepted Midwest's claim that it received no postcard notice" and it asserts that "Midwest's claim that it did not receive a postcard was immaterial given its duty to know the local rules and monitor its cases."

In support of its contention that the trial court violated its own rules, Village calls

---

1. Supreme Court Rule 84.04(d) requires that points relied on "state briefly and concisely what actions or rulings of the court are sought to be reviewed and wherein and why they are claimed to be erroneous...." In the leading case on compliance with Rule 84.04(d), *Thummel v. King*, 570 S.W.2d 679 (Mo.banc 1978), Judge Finch offered these observations about satisfying the *wherein* and *why* requirements of the rule:

> After stating the ruling the trial court actually made, it stands to reason that the point should then specify *why* the ruling was erroneous. This requirement essentially contemplates a statement which ordinarily will closely approximate what appellant believes should have been the trial court's conclusion of law on the point being addressed. After stating why the ruling was erroneous, the court then must be informed *wherein* the testimony or evidence gives rise to the ruling for which appellant contends.

*Id.* at 685. Despite its age, Judge Stone's article, "Effective Appellate Briefs," 15 Mo. BAR J. 80–91 (Feb.1959), remains one of the best guides available to writing points relied on.

In this point on appeal Village identifies the actions or rulings of the court to be reviewed

and why they are claimed to be erroneous, but the point fails to specify wherein the rulings or actions are erroneous. Most of Village's points relied on are similarly deficient; only Point Nine clearly complies with Rule 84.04(d). Points relied on that violate Rule 84.04(d) preserve nothing for review. *Hoffman v. Koehler*, 757 S.W.2d 289, 292 (Mo.App.1988). Although the requirements of Rule 84.04(d) are mandatory, this court, pursuant to former Rule 84.08(a) (*see* Missouri Rules of Court (West 18th ed. 1978)), has excused violation of the rule absent notice of the violation accompanied by an opportunity to correct it. *Id.; Black v. Cowan Const. Co.*, 738 S.W.2d 617, 619 (Mo.App.1987). Former Rule 84.08 was repealed, effective January 1, 1988.

Despite Village's failure to preserve for review most of the issues raised on this appeal, we have examined the arguments under each point to determine whether there has been plain error affecting substantial rights which, though not properly preserved, might have resulted in a manifest injustice or a miscarriage of justice. Rule 84.13(c); *Hoffman*, 757 S.W.2d at 292.

our attention to the circuit court's Rule 37.2 and *Hampton Bank v. Pfeil*, 537 S.W.2d 680 (Mo.App.1976). Local Rule 37.-2, quoted above, states that a case dismissed for lack of prosecution pursuant to Rule 8.2 may not be reinstated; it must be refiled as a new case. *Hampton Bank* stands for the general proposition that "rules of court properly adopted are binding on the court and its officers as well as on the parties and their counsel, and ordinarily it is the duty of the court to enforce them...." *Id.* at 681, quoting 21 C.J.S. *Courts* § 176 (1940). For the reasons that follow, we conclude that Local Rule 37.2 has no applicability in this case and the general principle stated in *Hampton Bank* does not mandate the conclusion Village urges.

■ Missouri circuit courts may adopt rules governing the administration of judicial business provided such local rules are not inconsistent with Missouri Supreme Court rules, the Missouri Constitution, and Missouri statutes in force. Supreme Court Rule 50.01; *see also* § 478.245.3, RSMo 1986. The court that enunciates a rule is the best judge of that rule. *State ex rel. Mo. Hwy. & Transp. Commn. v. McCann*, 685 S.W.2d 880, 884 (Mo.App.1984). Thus, a higher court is reluctant to interfere with a court's construction of its own rule. *State ex rel. Logan v. Ellison*, 267 Mo. 321, 184 S.W. 963, 964 (Banc 1916); *Braxton v. Bi–State Dev. Agency*, 728 F.2d 1105, 1107 (8th Cir.1984). *See generally* 21 C.J.S. *Courts* § 131 (1990).

■ Here the trial court, author of Local Rule 8.2, specifically found the rule did not require counsel to inquire about the status of a case and did not provide that mailing of a notice constituted actual notice to the addressee. Such a construction does not violate the plain terms of the rule. *See* 21 C.J.S. *Courts* § 131(a) (1990). Because the circuit clerk's mailing of the form letter did not constitute notice under local rules of the transfer to the inactive docket and because the attorneys for Midwest did not receive the notice, the trial court correctly concluded the case was not properly transferred to the inactive docket. As a result,

Local Rule 37.2 never came into operation and reinstatement to the active docket was proper. We hold that the trial court did not violate its local rules in ordering reinstatement of the case to the active docket and it did not exceed its jurisdiction in doing so.

■ Village, urging that the trial court "unreasonably accepted Midwest's claim that it received no postcard notice" calls our attention to *Dittmeier v. Missouri Real Estate Commission*, 316 S.W.2d 1, 5 (Mo.banc 1958), where the court stated, "There is a presumption that public officials have rightfully and lawfully discharged their official duties until the contrary appears," and *Jones v. Buckley*, 425 S.W.2d 204, 208 (Mo.1968), in which the presumption stated in *Dittmeier* was applied to a county clerk.

We believe the presumption extends also to circuit clerks, but the presumption does not aid Village. The presumption is not absolute because "record recitals do not necessarily foreclose further inquiry" into whether Midwest's attorneys received notice of the transfer of the case to the inactive docket. *Lassiter v. Martin*, 748 S.W.2d 819, 821 (Mo.App.1988). *See also Groves v. Hall*, 628 S.W.2d 420, 421–22 (Mo.App.1982). Even though the record has "absolute verity," *Brown v. General Motors Assembly Div.*, 695 S.W.2d 501, 502 (Mo.App.1985), the record shows only the preparation of a form letter by the clerk with the notation "cc: Leland C. Bussell" and the docket entry recital, "Atty's notified." In light of the trial court's interpretation of its own rule, that mailing the notice did not constitute actual notice, the record does not support the conclusion that Midwest's attorneys were notified of the transfer of the case to the inactive docket.

■ Finally, Village argues that the trial court's reinstatement order was erroneous because Midwest's claimed failure of receiving notice was "immaterial given its duty to know the (local) court rules and monitor orders in its case." Certainly, such a duty exists. *See, e.g., Meadowbrook Country Club v. Davis*, 384 S.W.2d 611, 613 (Mo.1964). Nevertheless, when

Village relies on the local rules as authority for automatic dismissal, it is bound by the circuit court's interpretations of its rules. As the trial court observed, the local rules at issue do not provide for a presumption that a notice mailed is a notice received, nor do the local rules impose a duty on lawyers to monitor their cases. Under the facts shown by this record, we reject the claim that the trial court erred in reinstating the case to the active docket.

## ISSUES TWO AND THREE: BREACH OF CONTRACT

Discussion of Village's points two and three requires us to set out in some detail certain provisions of the contract. The first page of the contract identifies it as The American Institute of Architects (AIA) Document A111: "Standard Form of Agreement Between Owner and Contractor where the basis of payment is the COST OF THE WORK PLUS A FEE (1978 Edition)" (Standard Agreement).

The contract called for Midwest to construct four 6–unit condominium apartment buildings, excluding carpeting, to be completed in four phases: (1) first building and all foundations, (2) second building, (3) third building, and (4) fourth building. Each phase was "to proceed only upon written direction of owner."

Under Article 4, the project was to begin upon execution of the contract and, "subject to authorized adjustments, Substantial Completion" was to be achieved not later than June 30, 1982, for Phase I. Phases II, III, and IV were to be substantially completed "120 days after owner direction."

Article 5, entitled Cost of the Work And Guaranteed Maximum Cost, provided (the underscored portions were typed onto the standard form by the parties):

5.1 The Owner agrees to reimburse the Contractor for the Cost of the Work as defined in Article 8. Such reimbursement shall be in addition to the Contractor's Fee stipulated in Article 6.

5.2 The maximum cost to the Owner, including the Cost of the Work and the Contractor's Fee, is guaranteed not to exceed the sum of *Seven hundred seventy-six thousand Seven hundred three dollars ($776,703.00)*; such Guaranteed Maximum Cost shall be increased or decreased for Changes in the Work as provided in Article 7. *As per attached "Exhibit B"*

....

*Letter from Midwest Materials Company dated November 9, 1981, attached hereto is incorporated herein.*

One of Midwest's witnesses was Terry Vigneaux, vice-president of Midwest at the time the contract was executed. Vigneaux testified he prepared the bid for the project and wrote the November 9, 1981, letter to Village. Vigneaux said "Exhibit B" and the November 9 letter referred to in Article 5.2 were the same document. In the letter, Vigneaux stated he was providing an "itemized breakdown" for various aspects of the project and a "proposed cost-plus type agreement for [Village's] consideration." The letter set out dollar amounts for each of 18 "construction categories," such as foundations, rough carpentry, and finish carpentry. Vigneaux testified on cross-examination that several of the amounts stated in his letter were increased following consultation with Village. The total of the revised amounts for each category totaled $726,703.00, the contract's guaranteed maximum cost less the $50,000.00 contractor's fee. The letter concluded with the following paragraphs:

Any labor, materials or sub-contract work will be charged to one of the above specific items. A complete accounting of each item except the contractor's fee shall be submitted monthly for payment. When items are billed as complete according to actual cost any savings indicated shall be considered savings totally belonging to the owner. When items are billed as complete according to actual cost any amount over the indicated amount as shown above shall be billed at cost plus 10% profit and overhead. The contractor's fee shall be billed separate in 4 equal amounts of $12,500.00 each in conjunction with completion of the project at 25% complete intervals. All monthly billings shall be paid in full with-

in 15 days. It is our contention that no retainage between the owner and general contractor be necessary since the performance bond and materials and labor bond fulfill our obligation for completion. Mike, we feel that this type agreement offers complete cost integrity for you the owner and enables us as the general contractor cost protection needed on our original proposal since some items of construction and specification or preference over the specifications as bid are going to change. As the construction plans become available we will begin to document these changes to keep you informed of the possible cost adjustments.

Article 6 of the contract provided for a contractor's fee of "50,000.00 upon completion of total project as noted in Midwest Materials letter dated November 9, 1981." Paragraph 6.2 provided that if there were changes in the work, the contractor's fee would be adjusted according to Midwest's letter of November 9, 1981. Village was to pay Midwest in increments of 25 percent "upon completion of 25%, 50%, 75% and 100% of project as determined by disbursement of total project cost."

Article 7, "changes in the work," provided:

**7.1** The owner may make Changes in the Work as provided in the Contract Documents. The Contractor shall be reimbursed for Changes in the Work on the basis of Cost of the Work as defined in Article 8.

**7.2** The Contractor's Fee for Changes in the Work shall be as set forth in Paragraph 6.2, or in the absence of specific provisions therein, shall be adjusted by negotiation on the basis of the Fee established for the original Work.

Article 8, "Costs to be Reimbursed," contained 16 preprinted paragraphs. The parties added paragraph 8.1.17 which provided: "The cost stated herein shall not exceed $726,703.00 without owner's written authorization."

Incorporated in the contract was AIA Document A210, General Conditions of the Contract for Construction (General Condi-

tions). General Conditions Article 8, entitled "Time," contained these provisions:

**8.3.1** If the Contractor is delayed at any time in the progress of the Work by any act or neglect of the Owner or the Architect ... then the Contract Time shall be extended by Change Order for such reasonable time as the Architect may determine.

**8.3.2** Any claim for extension of time shall be made in writing to the Architect not more than twenty days after the commencement of the delay; otherwise it shall be waived. In the case of a continuing delay only one claim is necessary. The Contractor shall provide an estimate of the probable effect of such delay on the progress of the Work.

Article 12 of the General Conditions, "Changes in the work," provides in pertinent part:

**12.1.1** A Change Order is a written order to the Contractor signed by the Owner and the Architect, issued after execution of the, Contract, authorizing a change in the Work or an adjustment in the Contract Sum or the Contract Time. The Contract Sum and the Contract Time may be changed only by Change Order. A Change Order signed by the Contractor indicates his agreement therewith, including the adjustment in the Contract Sum or the Contract Time.

**12.1.2** The owner, without invalidating the Contract, may order changes in the Work within the general scope of the Contract consisting of additions, deletions or other revisions, the Contract Sum and the Contract Time being adjusted accordingly. All such changes in the Work shall be authorized by Change Order, and shall be performed under the applicable conditions of the Contract Documents.

....

**12.3.1** If the Contractor wishes to make a claim for an increase in the Contract Sum, he shall give the Architect written notice thereof within twenty days after the occurrence of the event giving rise to such claim.... No such claim shall be valid unless so made.... Any change in

the Contract Sum resulting from such claim shall be authorized by Change Order.

In its second point on appeal, Village alleges the trial court erred in denying Village's motion for judgment notwithstanding the verdict on Midwest's claim because "Midwest failed to make a submissible case for breach of contract." In the argument under this point, Village contends Midwest did not prove its compliance with the terms of the contract and, therefore, cannot recover because of Village's alleged breach of the agreement. In support, Village points to the general rule that pleading and proof of performance is essential to recovery on an express contract. *See, e.g., Rosenthal v. Jordan,* 783 S.W.2d 452, 455 (Mo.App.1990).[2] Village argues "[t]he evidence was uncontradicted that Midwest ignored certain material provisions of the contract; thus, there was not sufficient evidence to support the jury's finding that [Midwest] was performing its agreement, or had performed it."

Village specifies the following as the material provisions ignored by Midwest:

A. Midwest's witnesses and its attorney admitted that the procedures in paragraph 12.3.1 of the general conditions of the contract were not followed, whereby the contractor was to make claims for increase in the contract sum by a written change order procedure.

B. Midwest's witnesses also admitted they failed to follow the contractual provision regarding extension of time.

Midwest admits the parties did not prepare written orders for changes in the work, and Midwest admits it did not make written requests for extensions of time on Phases I and II of the project.

We deal first with Village's argument that Midwest violated paragraph 12.3.1 of the General Conditions when it made claims for an increase in the contract sum without having followed the written change order procedure.[3] Village now argues, as it did at trial, that because the contract sum was calculated by adding the $50,-000.00 contractor's fee to the total of the figures for each construction category as set out in the November 9, 1981, letter, then the figures in the letter constitute guaranteed maximum costs for each respective construction category and any increase in cost in any category must be supported by compliance with the written change order procedure. Following this interpretation, Village argues that, because Midwest billed approximately $501,000.00 before completing two of the four buildings and exceeded 100 percent of the stated costs in two construction categories, all without following the change order procedure, then, as a matter of law, Midwest has not complied with all provisions of the contract and may not sue on the contract to recover for Village's alleged breach.

Midwest takes another view of the contract, contending written changes orders were required only after total cost of the project, exclusive of the contractor's fee, exceeded $726,703.00. For the reasons that follow, we believe Midwest's obligations under the contract to prepare written change orders was an issue for the jury.

Paragraph 12.3.1 of the General Conditions requires a written change order "(i)f the Contractor wishes to make a claim for an increase in the *Contract Sum* ... (emphasis added)." Paragraph 5.2 of the Standard Agreement states the contract sum to be $776,703.00. Village's position is valid only if paragraph 5.2 of the Standard

2. Midwest did not plead quantum meruit and did not submit its claim to the jury on that theory. Moreover, Midwest has repeatedly disavowed any allegation of waiver on the part of Village. Thus we face the question of whether Midwest, in compliance with the general rule as stated in *Rosenthal,* 783 S.W.2d at 455, has pled and proven its performance under the contract.

3. In its reply brief, Village argues that Midwest's failure to prepare written change orders also violated paragraph 12.1.1 of the General Conditions. Our understanding of paragraph 12.1.1 differs from Village's reading. The first sentence of 12.1.1 simply defines a change order. The second sentence requires a change order to change the contract sum or the contract time. The final sentence describes the effect of the contractor's signing a change order.

Agreement, as modified by the parties, "clearly and unambiguously" establishes that the parties intended that the figures in "Exhibit B," the November 9 letter, established guaranteed maximum costs in each construction category which could not be exceeded without written change order. *See Boswell v. Steel Haulers, Inc.,* 670 S.W.2d 906, 914 (Mo.App.1984). We do not believe paragraph 5.2 to be so clear and unambiguous. "Exhibit B," Midwest's letter of November 9, supports Midwest's position that the parties anticipated that at least some of the construction category cost figures in the letter would be exceeded. There is sufficient ambiguity in the contract to make the requirements concerning change orders a question for the jury. *See Boswell,* 670 S.W.2d at 914.

■ Village also claims in its argument that Midwest violated the contract by its failure "to follow the contractual provision regarding extension of time." Article 4 of the Standard Agreement required that substantial completion of Phase II be achieved "120 days after owner direction." Paragraphs 8.3.1 and 8.3.2 of the General Conditions provided that the contract time could be extended to compensate for delays provided the contractor requested in writing an extension of time.

As Village points out, it directed Midwest, in a May 20, 1982, letter, to begin Phase II; Midwest completed its work on December 22, 1982; and Midwest did not request extension of the 120–day completion deadline. What Village does not point out is that its May 20 letter limited Midwest's work on the second building to "outside structure and roof with an estimated cost to be $50,000.00. This approval is a 'limited approval' and does not provide for Midwest Materials to completely begin the Second Phase...." At an unspecified later date, Village gave Midwest oral authorization to complete construction of all of Phase II.

Village argues that paragraph 8.3 of the General Conditions is a "no fault" provision that requires Midwest to request in writing an extension of time even if the delay is caused "by any act or neglect of the Own-

er." This argument ignores the effect of the "limited approval" to proceed given Midwest by Village. We do not accept Village's implicit contention that it may authorize construction of a portion of the second building, withhold until later written authorization to complete the building, and then demand completion within 120 days of the initial limited authorization. Village does not advise us of the date it provided Midwest the written direction contemplated by Article 2 of the Standard Agreement to proceed with Phase II in its entirety.

■ The general rule as stated in *Rosenthal,* 783 S.W.2d at 455, notwithstanding, a party may successfully sue on a contract by pleading and proving part performance and prevention of further performance by the other party. *Berra v. Papin Builders, Inc.,* 706 S.W.2d 70, 73–74 (Mo.App.1986). Midwest pled and offered evidence to prove it performed its obligations under the contract.

■ Although Midwest did not plead prevention of performance by Village, the issue was tried by implied consent. Supreme Court Rule 55.33 provides in pertinent part:

**(b) Amendments to Conform to the Evidence.** When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.

Amendments to petitions pursuant to Rule 55.33(b), even during trial, are "quite usual." *Willett v. Reorganized School Dist. No. 2,* 602 S.W.2d 44, 53 (Mo.App. 1980). Failure to timely and specifically object to evidence beyond the scope of the pleadings constitutes consent for determination of issues thereby raised. *Arnett v. Venters,* 673 S.W.2d 67, 72 (Mo.App.1984). Issues raised by implied consent are treated as if raised by the pleadings even though the pleadings are not formally amended to conform to the evidence. *Id.*

Village did not object to admission into evidence of its May 20, 1982, letter which provided limited authorization to Midwest to proceed with Phase II, nor did Village

object to Midwest's evidence that subsequent authorization to complete Phase II was oral and came on an unspecified date. Thus, Midwest's pleadings were amended to allege prevention by Village of Midwest's performance of the contract provision requiring completion of Phase II within 120 days of written direction to proceed. On the facts before us, Midwest did not, as a matter of law, breach the contract provisions requiring it to request in writing extensions of time. The matter was properly for the jury.

■ Granting a judgment n.o.v. is the equivalent of directing a verdict at the close of the evidence. *Vinson v. Vinson,* 725 S.W.2d 121, 123 (Mo.App.1987). When a plaintiff's evidence shows he cannot recover as a matter of law, a verdict should be directed. *Bandag of Springfield, Inc. v. Bandag, Inc.,* 662 S.W.2d 546, 550 (Mo. App.1983). When determining whether a plaintiff made a submissible case, an appellate court presumes the plaintiff's evidence to be true and the plaintiff is given the benefit of all favorable inferences that reasonably can be drawn from the evidence. *Nickerson v. Moberly Foods, Inc.,* 781 S.W.2d 87, 90 (Mo.App.1989). Because the questions about Midwest's compliance with the contractual provisions regarding change orders and requests for extensions of time limits were jury questions, the trial court did not err in denying Village's motion for a judgment n.o.v. Point Two is denied.

Under Point Three, Village alleges the trial court erred in denying its judgment n.o.v. motion on its counterclaim "because there was no evidence to support the jury verdict in favor of Midwest." This point is without merit.

■ First, we note Village did not preserve, at trial, this allegation of error. Village's only motion for directed verdict immediately followed the presentation of Midwest's case-in-chief. Village made no directed verdict motion following presentation of its evidence and Midwest's rebuttal evidence. Rule 72.01(b), which governs motions for judgment notwithstanding the verdict, provides, in pertinent part: "Not

later than 15 days after entry of judgment, a party *who has moved for a directed verdict* may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict; ... (emphasis added)."

Village's failure to move for a directed verdict on its counterclaim is fatal to this point on appeal. *Empiregas Inc. of Branson v. Tri–Lakes Propane Co.,* 764 S.W.2d 156, 157 (Mo.App.1989). Nevertheless, we have made a gratuitous examination of the record on this point and conclude Village's contentions lack merit. *See id.*

As stated, Village's request for a judgment n.o.v. on its claim is the equivalent of seeking a directed verdict at the close of the evidence. *Vinson,* 725 S.W.2d at 123. The following principles of law concerning directed verdicts for parties with the burden of proof are applicable to this point on appeal:

> Directed verdicts are drastic actions.... Parties bearing the burden of proof are generally not entitled to directed verdicts. However, a [counterclaim] plaintiff is entitled to a directed verdict when it establishes its claim as a matter of law with no factual question remaining for the jury and the [counterclaim] defendant fails to establish its alleged affirmative defenses. A verdict may be directed against a [counterclaim] defendant when it admits in pleadings, by counsel, or in individual testimony to the truth of the basic facts supporting the [counterclaim] plaintiff's claim.

*Bank of Brookfield–Purdin v. Burns,* 724 S.W.2d 262, 264 (Mo.App.1986) (citations omitted).

■ Village, in contending it is entitled to judgment on its counterclaim as a matter of law, summarizes its argument as follows:

> In three particular contractual areas Midwest did not introduce any credible evidence that it had abided by the contract: (1) its duty to build the condominiums, specifically the porches, according to the architect's plans, (2) its duty to

timely complete the phases of the construction; and (3) its duty to follow the change order procedures in the contract. Where there is no evidence to support a verdict, it should be reversed. *Marshall v. Edlin,* 690 S.W.2d 477, 479 (Mo.App. 1985).

Village's argument, as summarized, runs counter to the law as stated in *Bank of Brookfield–Purdin* in that it inappropriately shifts Village's burden of establishing its claim as a matter of law to Midwest to disprove Village's claim.

In our discussion of Village's Point Two, we concluded that questions about Midwest's compliance with contract provisions regarding change orders and time limit extensions were factual issues for the jury. Under this point relied on, then, we are left with Village's assertion that there was no factual question for the jury about whether Midwest failed to build the porches according to the architect's plans and, therefore, Village was entitled to judgment on its counterclaim as a matter of law.

In order to recover on a breach of contract theory, a party must plead and prove, among other elements, damages resulting from the alleged breach. *Berra,* 706 S.W.2d at 73–74. Under the law as stated in *Bank of Brookfield–Purdin,* 724 S.W.2d at 264, for Village to be entitled to judgment on its claim as a matter of law, Midwest must admit the alleged damages resulted from Midwest's alleged failure to build the porches according to the architect's plans. In its brief and reply brief, Village points to no such admission by Midwest. Village's discussion of causation is limited to these two sentences in its reply brief:

> [N]one of the witnesses called by Midwest rebutted the testimony from Herb Brownell, the contractor hired by Village to tear down the existing porches and rebuild them, that the porches were damaged because Midwest failed to install a drip edge called for in the drawings which would have prevented the water damage. This water damage ultimately caused the porches' deterioration.

The only testimony about causation cited by Village is that of its own witness. Such testimony does not constitute an admission by Midwest. *See Bank of Brookfield–Purdin,* 724 S.W.2d at 264.

All matters raised by Village under Point Three were for the jury to decide. The trial court did not err in denying Village's motion for judgment n.o.v. on its counterclaim.

## ISSUE FOUR: IMPROPER JURY ARGUMENT

A significant part of Village's breach of contract counterclaim was that Midwest failed to follow the original drawings, and that failure caused the condominium apartment porches to rot prematurely. Part of Village's evidence came from Herbert Brownell, a building contractor, who testified that Village hired him to replace the porches. In its defense to Village's counterclaim, Midwest read to the jury, without objection, appellant Ruppert's answers to two of Midwest's interrogatories. The answers revealed all but two of the condominium units had been sold. One interrogatory answer recited the names of the purchaser of each unit and the date of purchase of each unit.

During the rebuttal portion of his closing argument, Midwest's attorney made the following statements:

> MR. BUSSELL (Midwest's attorney): ... [Mr. Brownell] rebuilt these porches at $3000.00 a piece.... *[O]ne of those didn't even belong to Mr. Ruppert.* They are asking you to give them money for things to be done on units that they don't even own. They own two of these that they made the changes but they didn't own all three of them only owned two of them. *Now they're asking you to give them money to build porches on somebody else's property* and I don't think that—there's nobody else appeared in here and said their porch was damaged. Nobody else came in here and testified that—
>
> MR. LAMB (Village's attorney): Your Honor, adverse inference, those people are equally available to him.

MR. BUSSELL: Well, they didn't come.

THE COURT: Objection overruled. Argue the evidence and reasonable inferences. (Emphasis added.)

In its motion for a new trial, which was overruled by the trial court, Village claimed Midwest's closing argument was "erroneous, prejudicial and deprived [Village] of a fair trial." Village included with its new trial motion the affidavit of appellant Ruppert who stated that Village owned the porches and that the unit owners had been granted easements "to use and occupy" the porches for their respective units. Attached to the Ruppert affidavit was a copy of the "Declaration of Condominium of Swiss Village Condominium." The facts contained in appellant Ruppert's affidavit and the Declaration of Condominium had not been presented to the jury.

Village now contends it was

deprived of a fair trial when [Midwest's] counsel incorrectly argued, in the final portion of his closing argument, that Village did not own the condominium porches to which repairs had been made, and the court erred in overruling the objection to the adverse inference made in support of this prejudicial argument; hence the trial court abused its discretion in failing to order a new trial when [Village] proved the untruth of this statement in its new trial motion.

▮ We note that Village's objection at trial was limited to the negative inference complaint; Village did not complain that Midwest's attorney's statements were factually incorrect. Thus the matter of Midwest's counsel's misstatement of fact, even if properly raised in the point relied on, was not preserved for our review because this court may not consider grounds for an objection to a closing argument that were not asserted at trial. *Handshy v. Nolte Petroleum Co.*, 421 S.W.2d 198, 202 (Mo. 1967); *Dummit v. Burlington N. R.R.* 789 S.W.2d 136, 139 (Mo.App.1990).

▮ Nevertheless, we examine, under the plain error standard, the merits of Village's allegations of error concerning the factual misstatement during closing argu-

ment. Village relies in part on *Laclede Investment Corp. v. Kaiser*, 541 S.W.2d 330 (Mo.App.1976), which states the general rule that it is reversible error for counsel to tell or imply to the jury that the other party is "not interested in the defense of the case or would not have to pay any judgment awarded" because of insurance. *Id.* at 339. Village argues that the reasoning in *Laclede* applies to this case because Midwest's closing argument improperly suggested that "Village had no financial interest in the porches."

We do not agree that the principle stated in *Laclede* controls. The court in *Laclede* was faced with a statement made at closing argument by plaintiff's counsel that strongly suggested a judgment against defendant would not be collectible. The court of appeals pointed out that collectibility was not an issue framed by the pleadings, and the jury should not have considered the potential collectibility of the judgment in arriving at its verdict. *Id.* at 338–39.

One of the issues framed by the pleadings in the case before us was whether Village was damaged by Midwest's alleged breach of contract. In attempting to meet its burden of proof on its counterclaim, Village offered evidence that faulty construction practices by Midwest had resulted in rapid rotting of structural components and, as a result, Village had replaced three of the porches and had contracted with Brownell for the replacement of nine others. There also was evidence that Village began selling the units in 1982 and, at the time of trial, ten of the twelve units had been sold, but there was no evidence before the jury that Village retained ownership of the porches. Given these facts, Midwest's attorney's statements that appellant Ruppert did not own the units and that Village was asking the jury for "money to build porches on somebody else's property" could reasonably have been construed by the trial court as a challenge to the credibility of Village's evidence that it had been damaged by Midwest's alleged defective work. *See State ex rel. Div. of Family Services v. Duncan*, 782 S.W.2d 457, 459–60 (Mo.App.1990).

The jury was not bound to accept at face value everything that Village's witnesses said. *Aron v. Resz*, 343 S.W.2d 81, 82 (Mo.App.1961). Moreover, in closing argument, counsel may properly refer to and comment on the other party's evidence, and he is not obligated to point out evidence which favors his opponent. *Titsworth v. Powell*, 776 S.W.2d 416, 420 (Mo.App.1989). We conclude that the argument of Midwest's counsel did not go beyond the issues and did not urge a defense which the evidence did not justify. *See Langley v. Michael*, 710 S.W.2d 373, 376 (Mo.App.1986).

We turn now to Village's contention that Midwest's counsel's comments that "[n]obody else came in here and testified" impermissibly implied to the jury that the testimony of the condominium unit owners would have been unfavorable to Village. In its main brief, Village summarizes the purported negative implication by Midwest as follows: "Midwest's counsel argued that the failure of the condominium owners to appear and testify supported his argument that these people actually owned the porches and that Village was therefore not damaged by the need to repair them." In its reply brief, Village recasts the negative inference Midwest's counsel wanted the jury to draw as follows: "[Midwest's attorney] obviously wanted the jury to believe that those owners, if they had been called, would have testified that they had no damages, or that their damages were minimal."

Village directs our attention to the general rule that it is improper for a party to argue to the jury the negative inference drawn from his opponent's failure to produce a witness who is equally available to both parties. *See, e.g., Kelly by Kelly v. Jackson*, 798 S.W.2d 699, 701 (Mo.banc 1990). For a trial court to permit such an argument is reversible error, and if the trial court overrules an objection to such an argument, it is prejudicial error. *Id.*

In applying the general rule as stated in *Kelly*, we consider the propriety of the challenged comments in light of the entire record rather than in isolation. *Lewis v. Bucyrus–Erie, Inc.*, 622 S.W.2d 920, 926 (Mo.banc 1981). In the case before us, there was no dispute that the porches had rotted. At dispute was whether defective work by Midwest caused the porches to rot and who sustained the damage as a result of the rotted porches. Midwest was arguing that someone other than the appellants owned the units and, by inference, the porches when the challenged statement was made. Given the context in which the statements were made and considering the lack of evidence about Village's ownership of the porches, the thrust of the challenged argument was that Village had failed in its burden of proving damages from the alleged breach of contract because it no longer owned the units. *See Lewis*, 622 S.W.2d at 926; *Eagleburger v. Emerson Elec. Co.*, 794 S.W.2d at 227.

The challenged statements also could be viewed as retaliatory. In his closing argument, counsel for Village asked the jury for approximately $38,000.00 to repair all twelve porches. In light of the evidence that Village had sold ten of the twelve units and the lack of evidence that Village had retained ownership of the porches, Midwest was justified in its "fair retort." *See Lewis*, 622 S.W.2d at 927.

A trial court has an opportunity far superior to ours to fairly appraise the impact of an argument on a jury. *Langley*, 710 S.W.2d at 376. Thus the trial court has broad discretion in the area of closing arguments; such discretion is not lightly to be disturbed on appeal. *Lewis*, 622 S.W.2d at 925. With these principles in mind, and for the reasons given above, we conclude the trial court did not err in overruling Village's objection to the challenged portion of the closing argument and in denying the new trial motion.

### ISSUE FIVE: ALLEGED ERROR IN COUNTERCLAIM JURY INSTRUCTION

The trial court refused to submit Village's proposed counterclaim verdict director (Instruction "B") which read:

Your verdict must be for defendant Village Development Co. on its counter-

claim for breach of contract if you believe:

First, defendant and plaintiff entered into an agreement whereby defendant agreed to pay plaintiff for construction work performed according to *the guaranteed maximum cost requirements* of the contract dated December 2, 1981, and agreed to pay for properly authorized *increases in the guaranteed maximum cost categories* of construction, and plaintiff agreed to substantially complete Phase I and Phase II of the condominium construction project on time; and agreed to perform construction work of good quality and in conformance with the contract documents; *and agreed to follow the maximum cost requirements of the contract; and agreed to charge defendant Village Development Company only for work that was to be reimbursed under the contract; and agreed to properly claim increases in the cost of the work;* and

Second, defendant performed its agreement;

Third, plaintiff failed to perform its agreement; and

Fourth, defendant Village Development Company was thereby damaged. (Emphasis added.)

Instead, the trial court drafted and gave Instruction 11 as Village's counterclaim verdict director:

Your verdict must be for defendants Theodore A. Ruppert and R. Michael Webb, as Village Development Co., on their counterclaim for breach of contract if you believe:

First, defendants and plaintiff entered into an agreement whereby defendants agreed to pay plaintiff for construction work performed according to the contract dated December 2, 1981, and defendants agreed to pay for authorized changes in the cost of construction; and plaintiff agreed to complete the construction work on Phase I not later than June 30, 1982, and to complete the construction work on each other phase not later than 120 days after directed to proceed with each respective phase, and plaintiff

agreed to perform construction work of good quality and in conformance with the contract documents, and,

Second, defendants performed their agreement, and

Third, plaintiff failed to perform its agreement, and

Fourth, defendants Theodore A. Ruppert and R. Michael Webb, as Village Development Company, were thereby damaged.

■ Village's fifth point on appeal states in its entirety, "The trial court erred in improperly instructing the jury on Village's counterclaim by refusing Village's proposed verdict director and substituting the court's own verdict director, which by its terms violated M.A.I. 26.06 and prejudiced Village."

Village argues that, because the trial court omitted from Instruction 11 the underlined phrases in Instruction "B," it impermissibly deviated from MAI 26.06 because "[w]here the terms of an agreement are in dispute the verdict directing instruction must hypothesize the proponent's version of that agreement." *Schlemer v. Connell Agencies*, 741 S.W.2d 307, 308 (Mo.App.1987). Village contends Instruction 11 omitted "at least three key portions of Village's verdict director that were tied to its evidence of breaches by Midwest."

■ First we examine Instruction "B," the rejected verdict director on Village's counterclaim. The language of an instruction should be so plain that there can be no doubt about its meaning. *Braun v. Lorenz*, 585 S.W.2d 102, 109 (Mo.App. 1979). Moreover, an instruction must define for the jury legal or technical terms occurring in the instructions. *Brock v. Firemen's Fund of America Ins. Co.*, 637 S.W.2d 824, 827 (Mo.App.1982). Without definition of the terms "guaranteed maximum cost requirements" and "guaranteed maximum cost categories," Instruction "B" would have been confusing to the "ordinary juror." *See Brock*, 637 S.W.2d at 827. We find no error, plain or otherwise, in the trial court's rejection of Instruction "B".

▮ Moving to Instruction 11, the counterclaim verdict director drafted and submitted by the court, we first observe that at the instruction conference Village's counsel declined to object to Instruction 11.

The Court: Those objections (by Midwest) are overruled. Anything on behalf of the defendants?

Mr. Lamb: Defendant for the record would object to Instruction Number 7, verdict director for plaintiff ... for the reasons ... *That's the only objection.*

The Court: Objection overruled. Anything further.

Ms. Jackson: No.

Mr. Lamb: *No.* (Emphasis added.)

Midwest argues that Village waived its objection to Instruction 11. In response, Village invokes the protection of Rule 70.03 which states in part: "Counsel need not object to any instructions to be given ... by the court ... or to the refusal of any instructions requested by such party." But Rule 70.03 protection is not absolute. *Points v. Dzur,* 713 S.W.2d 634, 635 (Mo. App.1986). In *Points,* the court discussed *Hudson v. Carr,* 668 S.W.2d 68 (Mo.banc 1984), and *Fowler v. Park Corp.,* 673 S.W.2d 749 (Mo.banc 1984), cases involving failure by counsel to object to jury instructions. The *Points* court summarized the reasoning in *Hudson* and *Fowler* thus: "[I]f counsel failed to detect the error its prejudicial impact must be minimal, and if counsel noted the error and remained silent he has waived any objection he may have to a correctly instructed jury." 713 S.W.2d at 635.

Village now argues Instruction 11 misled the jury. We question whether a jury would be misled or confused if the alleged defect in the instruction was not readily apparent to an alert counsel, who had worked with this case for many years and was thoroughly familiar with his counterclaim theory. *See Murphy v. City of*

*Springfield,* 794 S.W.2d 275, 280 (Mo.App. 1990).

Our examination of this record does not convince us that Village's counsel was "sandbagging." "Sandbagging" is the practice in which counsel remains silent at the instruction conference with the hope his opponent will request (or the judge will give) an erroneous jury instruction. *Murphy,* 794 S.W.2d at 279. What does seem to follow is that the claimed prejudicial effect of the instruction did not occur to Village until after the verdict. *See Murphy,* 794 S.W.2d at 279.

Instruction 11 correctly tracked the language of MAI 26.06. *See Kim v. Conway & Forty, Inc.,* 772 S.W.2d 723, 725–27 (Mo. App.1989). To any extent that the instruction might have been erroneous because it failed to hypothesize Village's breach of contract theory to the jury, we find that it was not prejudicial under the doctrines enunciated in *Hudson,* 668 S.W.2d 68, and *Fowler,* 673 S.W.2d 749.[4]

## ISSUE SIX: EVIDENCE OF FAILURE TO PAY ARCHITECT

▮ Midwest called project architect Phillip Smith as a rebuttal witness. Midwest's attorney asked Smith why he stopped working on the project. Smith answered, "Ted (Ruppert) didn't want to pay us any more money." In response to further questioning, and over objection by Village on grounds of relevance, Smith said he believed Ruppert still owed him approximately $2,500.00.

Village now contends the trial court erred in overruling its objection and in denying its new trial motion because "testimony that Village had not paid the bills of the project architect" was "irrelevant and inflammatory." Village argues that "Midwest wanted to prejudice the jury against Village by introducing wholly irrelevant testimony that would cause the jury to

**4.** In its reply brief Village says that it would have been "redundant and disrespectful" to object to the trial court's verdict director on the counterclaim. That argument is less than persuasive, however, because the record shows that the trial court also prepared the verdict director on Midwest's claim. Village's counsel showed no reluctance in voicing objections to that instruction.

believe that Village was some type of deadbeat that did not pay its bills."

In support of its argument, Village calls our attention to *Conley v. Kaney*, 250 S.W.2d 350 (Mo.1952), for the proposition that a trial court should exclude evidence pertaining to collateral matters if it would "cause prejudice wholly disproportionate to the value and usefulness of the offered evidence," *Id.* at 353, and *Slusher v. Jack Roach Cadillac, Inc.*, 719 S.W.2d 880 (Mo. App.1986), in which the court stated that evidence is prejudicial "if it tends to lead the jury to decide the case on some basis other than the 'established propositions in the case.'" *Id.* at 882.

As a general rule, the determination of the relevance of proof offered at trial is for the sound discretion of the trial court and is not ordinarily reviewable upon appeal. *Radloff v. Penny*, 225 S.W.2d 498, 503 (Mo.App.1949). The trial court's wide discretion extends to determination of the admissibility of evidence on collateral matters. *Boehmer v. Boggiano*, 412 S.W.2d 103, 110 (Mo.1967); *Barrett v. Flynn*, 728 S.W.2d 288, 293 (Mo.App.1987). Village's argument and authorities notwithstanding, we conclude the trial court did not abuse its discretion.

In its defense against Midwest's claim and in its presentation of its counterclaim, Village sought to prove that Midwest had breached the contract by not following these provisions of the General Conditions of the contract:

8.32: Any claim for extension of time shall be made in writing to the Architect....

12.1.1: A Change Order is a written order to the Contractor signed by the Owner and the Architect.... The Contract Sum and the Contract Time may be changed only by Change Order.

12.3.1: If the Contractor wishes to make a claim for an increase in the Contract Sum, he shall give the Architect written notice....

As we noted under Point Two, Midwest presented evidence that Village prevented Midwest's full performance under the contract, thereby entitling Midwest to sue on the contract. Because the contract clearly anticipates cooperation between the owner and the architect, evidence of difficulties between them would be relevant to an argument by a contractor that its performance was prevented by the owner. Thus we find that the evidence objected to was not "wholly irrelevant" as Village claims.

In *Slusher*, cited by Village, the evidence under consideration was the back page of a motor vehicle buyer's order and a blow-up of the "as is" clause contained on the back page. The court held admission of the back page and the "as is" clause was prejudicial error because a contract provision is not a defense to a claim of fraud. 719 S.W.2d at 882–83. The court concluded the evidence "clearly led the jury to believe it could decide the case on some basis other than the propositions at issue in the case." *Id.* at 883.

*Slusher* does not control the case before us. In *Slusher* the challenged evidence wrongly permitted the jury to decide that a contract provision provided the automobile dealer a defense to an action in fraud. In our case, Smith's comment that he believed appellant Ruppert owed him money would not have caused the jury to decide one way or another any of the propositions at issue in Midwest's claim or Village's counterclaim. Under the circumstances of this case, the statement by Smith was not so manifestly inflammatory or prejudicial that it requires this court to grant a new trial. *See Kraus v. Auxvasse Stone & Gravel Co.*, 444 S.W.2d 434, 437 (Mo.1969). The trial court did not err in overruling Village's objection.

## ISSUE SEVEN: EVIDENCE OF INCREASED COST OF WORK

Before trial Village filed a motion in limine seeking to preclude Midwest from introducing evidence or arguing to the jury that Village waived any of the contract provisions, in particular the provisions concerning "procedures for increasing the cost of the work." The trial court overruled the motion.

The trial court admitted into evidence, over Village's objection, Midwest's exhibit 38, four documents entitled Architect's Supplemental Instructions. Three of the documents bore no signatures; the fourth was signed by the project architect. All were dated February, March, or April 1982. Midwest's witness Terry Vigneaux testified that the changes in the work called for by the documents compiled as exhibit 38 were performed by Midwest, that the changes resulted in a substantial increase in the cost of the project, and that Village was charged for the increased cost. Village objected to the introduction into evidence of exhibit 38 on various grounds, none of which is raised on appeal except that the documents contained in exhibit 38 constituted "extrinsic evidence regarding this issue of waiver."

In this point on appeal, Village claims the trial court erred in overruling its motion in limine and its objection at trial to exhibit 38, which was "evidence concerning Village's alleged waiver of the contract provisions pertaining to increases in the cost of the work...." Village argues Midwest should not have been allowed to prove waiver because it had not pled waiver.

The complaint about the trial court's overruling of the motion in limine presents nothing for our review. A ruling on a motion in limine regarding the admission or suppression of potential evidence is interlocutory and presents nothing for appellate review unless preserved by timely objection during trial when the evidence is offered. *Robbins v. Jewish Hospital of St. Louis,* 663 S.W.2d 341, 348 (Mo.App.1983). By objecting at trial, Village did preserve for review the issue of the admissibility of exhibit 38. Nevertheless, for the reason that follows, Village's objection at trial to exhibit 38 was properly overruled.

As Village correctly points out, Midwest admits it never claimed, in its pleadings or at trial, that Village waived the provisions of the contract. But exhibit 38 was relevant to issues other than waiver. We have already determined that Midwest's interpretation of the contract's change order provisions was for the jury. Thus, the

evidence contained in Midwest's exhibit 38 was admissible to show Midwest performed changes required by Village and the changes resulted in increased cost. There was no error by the trial court.

## ISSUE EIGHT: REFUSAL TO ADMIT VILLAGE'S EXHIBITS

Village sought to prove that it incurred expenses as a result of allegedly defective construction by Midwest. Appellant Ruppert testified about those expenses, and Village sought to place into evidence numerous invoices, canceled checks, and other documents as exhibits in support of Ruppert's testimony. The trial court ultimately rejected the following exhibits:

K–1, billing from Herb Brownell for replacement of three porches;

L–1, invoice for labor to paint three porches;

M–1, invoice for materials to paint three porches;

N–1, canceled checks paying various expenses related to the replacement of three porches;

H–1, a four-page recapitulation of expenses incurred by Village for repairs;

I–1, canceled checks corresponding to the expenses itemized in H–1;

J–1, original invoices corresponding to the expenses itemized in H–1;

P–1, a list of Village employees and appellant Ruppert and dollar amounts attributed to their work in repairing construction defects;

V–1, W–1, Y–1, X–1, U–1, S–1, Z–1, R–1, and T–1, individual employee time sheets corresponding to the summary contained in P–1;

A–2, canceled checks for wages corresponding to the employee time sheets and P–1;

Q–1, a summary of "additional" repairs made during 1985, 1986, 1987, and 1988.

During offers of proof, appellant Ruppert said he did not know whether the replacement porches were built in accordance with the original specifications. He identified exhibits K–1, L–1, M–1, and N–1.

The trial court sustained Midwest's objection that these exhibits were not admissible because the replacement porches "were not built in accordance with the plans and specifications which were furnished to Midwest...." Appellant Ruppert testified that each of the remaining exhibits included costs for materials and labor to construct a deck to cover the footings of the foundation of the third apartment building which was not built.

Later in the trial, Brownell testified he did not rebuild the porches according to the original plans, but he said the only significant cost difference was his use of steel support posts rather than wood. The use of steel posts increased the cost of each porch approximately $200. During his testimony, Brownell identified Village's exhibit J–2 as his "original record of the expenses incurred" in removing the old porches and replacing them. J–2 also reflects payments by Ruppert to Brownell, and Brownell testified he was paid by Ruppert for his work. The trial court admitted exhibit J–2 into evidence. Exhibit J–2 contains the same information as contained in rejected exhibit K–1; in fact, K–1 appears to be a photocopy of J–2. After Brownell's testimony, exhibit N–1 was never re-offered by Village.

In this point on appeal, Village contends the trial court erroneously excluded all of the above exhibits which were "probative of damages sustained by Village...." Village argues that under paragraph 6.2.3 of the General Conditions, Midwest was responsible for cost of repairs resulting from "defective or illtimed work...." Village contends many of the repairs it performed, such as repairing plumbing that froze due to allegedly improper installation, did not involve reconstruction and, therefore, the original plans and specifications were irrelevant.

■ We find no error by the trial court in rejecting exhibit K–1 for the obvious reason that the same information was presented to the jury by exhibit J–2 after Village used testimony by Brownell to lay a proper foundation for its admission. Village was not prejudiced by the rejection of exhibit K–1 when the same information, offered for the same purpose, was presented to the jury by exhibit J–2.

■ We also find no error in the rejection of exhibits L–1, M–1, and N–1. At the time the trial court rejected L–1, M–1, and N–1, there was no evidence the replacement porches were built according to the original specifications. In addition to appellant Ruppert's testimony, there was evidence from Jack Sorkin, an architect hired by Village, that he and a structural engineer had prepared drawings to enable the porches to be "rebuilt safely." Sorkin said he believed his drawings were used by Brownell when he rebuilt the three porches. Sorkin said that his plans "partially" followed the original plans and that the two sets of plans did "differ in some respects."

■ Given that background, we decline to convict the trial court of error for refusing to admit exhibits L–1, M–1, and N–1. In a suit for breach of a construction contact, where there is substantial but defective performance, the owner is entitled to a sum that would reasonably be required to remedy the defects and make the structure conform to the plans and specifications. *Mathis v. Glover*, 714 S.W.2d 222, 228 (Mo.App.1986); *Forsythe v. Starnes*, 554 S.W.2d 100, 109 (Mo.App.1977). When exhibits L–1, M–1, and N–1 were offered, Village had failed to lay a foundation that the expenses listed in those exhibits were reasonably required to make the structure conform to the original plans and specifications. Possibly, after Brownell's testimony, a proper foundation for offering L–1, M–1, and N–1 did exist. However, Village did not later offer them. We will not, on review, convict the trial court of error on an issue which was not put before it to decide. *Dixon v. Bradsher*, 779 S.W.2d 727, 733 (Mo.App.1989).

■ Concerning the remaining exhibits, it is apparent from the transcript that the court was aware of Village's assertion that the exhibits included evidence of Village's costs incurred in repairing allegedly defective work. But it also is clear that the trial court refused to admit these various exhib-

its because they included costs for labor and materials used for covering the footings of the third foundation. Evidence about those costs was not admissible because construction of the deck was not a repair and was not called for in the original plans. Where, as here, the proffered documents contained both admissible and inadmissible evidence, the trial court did not commit error in excluding the documents. *State ex rel. State Highway Comm'n. v. Koberna*, 396 S.W.2d 654, 666 (Mo.1965). Here the documents contained both admissible and inadmissible material, and Village made no effort to offer only admissible portions. The trial court did not err in excluding the entire exhibit. *Ensminger v. Stout*, 287 S.W.2d 400, 407 (Mo.App.1956). This point is ruled against Village.

### ISSUE NINE: JUROR MISCONDUCT

In this, its final point on appeal, Village claims the trial court erred in not granting it a new trial because of alleged juror misconduct by Mary Lou Cernik. Cernik was among the nine members of the jury who voted in favor of Midwest on both its claim and Village's counterclaim.

On the circuit court's "juror questionnaire" form, which apparently is sent to all persons called for jury duty, Cernik answered "No" when asked if she or any member of her immediate family had been "a party to any lawsuit." Cernik signed the unsworn questionnaire and returned it to the court.

During voir dire, Midwest's attorney asked the entire panel if any of them had been a party in a lawsuit. The attorney added, "And let's exclude from this question divorce cases." Cernik responded:

VENIREMAN CERNIK: About three years ago, we brought a lawsuit against—I believe it was called Carra Construction. We dropped the case against him because my husband and I had separated so he didn't want to really continue that suit without me being there.

MS. JACKSON: What was that suit over?

VENIREMAN CERNIK: Liens on the property.

Later, Midwest's counsel asked if any of the panel had been involved "in a dispute over a contract, over a written contract." Cernik responded:

VENIREMAN CERNIK: When we bought our home, everything wasn't done at closing, so we filed a lawsuit and got our money that was in escrow awarded to us.

MS. JACKSON: And that would have been over a contract probably.

VENIREMAN CERNIK: Yes.

During his inquiry, Village's counsel conducted the following examination of Cernik:

MR. LAMB: Ms. Cernik, you had a construction case where you or your husband were plaintiffs?

VENIREMAN CERNIK: Yes.

MR. LAMB: Just tell me what the dispute was, briefly.

VENIREMAN CERNIK: Well, like I said before—

MR. LAMB: Liens? Did you claim they didn't do the work right or they claim you didn't pay them.

VENIREMAN CERNIK: We know we paid them and they were claiming that we didn't.

MR. LAMB: You had checks and invoices to prove you paid them?

VENIREMAN CERNIK: That's right. And then we were told we have a slip in a four-well dock, and the dock didn't exist.

MR. LAMB: So did they file a counterclaim?

VENIREMAN CERNIK: Yes.

MR. LAMB: You sued them first?

VENIREMAN CERNIK: Yes.

MR. LAMB: And it was settled because of the situation you mentioned?

VENIREMAN CERNIK: That's right.

The trial court docket sheet indicates Midwest's challenge to Cernik for cause was overruled. After the parties exercised their peremptory strikes, Cernik was selected to serve on the jury.

At the hearing on its post-trial motions, Village presented as exhibits copies of the juror questionnaire completed by Cernik, petitions from three lawsuits involving Cernik, and the summons to Cernik in one of those lawsuits. From two of the petitions, the following facts emerge.

In May 1984, Cernik and her husband agreed to purchase a residential lot and a boat dock slip from Mark Frese. As part of the transaction, Frese Tara Construction Co., of which Mark Frese was an officer and director, was to build the boat dock slip and construct a house on the lot. On July 3, 1984, Mark Frese provided the Cerniks a bill of sale for the boat dock slip and on July 5 he conveyed the real estate to them.

In January 1985, Morgan Wightman Supply Co. filed a petition to enforce a mechanics lien against the Cerniks' real estate. In its petition, Morgan Wightman alleged that Frese Tara Construction Co. had not paid for building materials that Frese Tara had used for improvements to the Cerniks' lot. In February 1985, Mary Lou Cernik was served with a summons and petition in the mechanics lien suit.

In July 1985, the Cerniks filed a four-count petition seeking actual and punitive damages against Mark Frese and Johnnie Frese, individually, and Mark Frese, Johnnie Frese, Janet Frese, and Dana Frese, as trustees of Frese Tara Construction Co., which by this time had forfeited its corporate charter. The petition, which pled fraud and breach of contract, alleged the boat dock did not exist and the boat dock slip was never conveyed to the Cerniks.

The third petition presented at the hearing on Village's post-trial motions was a petition for dissolution of marriage filed by Cernik against her husband in September 1985.

At the post-trial hearing, Cernik testified about her completion of the juror questionnaire, her responses to questions on voir dire, and her involvement in the various lawsuits. Because the transcript of the voir dire examination was not available at the time of the post-trial hearing, Village's attorney sought leave to file "a short supplemental memorandum." The court responded, "I will not permit you to do it. I will rule on it today." The trial court then overruled both of Village's post-trial motions, "the court specifically finding that juror Cernik's failure to disclose having been a party to lawsuits filed but not tried was unintentional...."

■ In this point on appeal, Village alleges the trial court erred in overruling its new trial motion. Village contends it was deprived of its right to a fair and impartial jury because Cernik "intentionally concealed her involvement in prior lawsuits and intentionally misstated the facts and circumstances of the one lawsuit she belatedly acknowledged."

Village argues that Cernik's completion of the juror questionnaire and answers to questions on voir dire place her responses squarely within the definition of intentional nondisclosure as set out by our supreme court in *Williams by Wilford v. Barnes Hospital*, 736 S.W.2d 33, 36 (Mo.banc 1987):

> Intentional nondisclosure occurs: 1) where there exists no reasonable inability to comprehend the information solicited by the question asked of the prospective juror, and 2) where it develops that the prospective juror actually remembers the experience or that it was of such significance that his purported forgetfulness is unreasonable.

In its argument, Village emphasizes the importance to this case of the second prong of the two-part *Williams* inquiry. Village's argument on the first prong consists of the following:

> In this case there can be no doubt regarding the first inquiry. Ms. Cernik admitted at the post-trial hearing that she understood the question in the juror disclosure form pertaining to lawsuits:
> [Testimony from post-trial hearing omitted].
> Moreover, it is obvious she understood the questions in *voir dire* about lawsuits because she identified one of those to which she had been a party, even though the information she provided was inaccurate.

Village admits Cernik disclosed on voir dire her involvement in the lawsuit against the Freses but claims "the facts she related about the case were inaccurate and incomplete in several significant aspects." Village characterizes Cernik's voir dire answers concerning the suit against the Freses as "inaccurate, incomplete and, in some instances, incredible" in the following respects:

   (1) She incorrectly described the lawsuit she filed as one involving liens.

   (2) She misstated the name of the defendant as "Carra Construction" when in reality the defendants were individuals.

   (3) She falsely stated the lawsuit was settled because of her separation from her husband, and she got her escrow money refunded.

Village also charges Cernik never mentioned on voir dire the mechanics lien suit in which she and her husband were named defendants.

Cernik's voir dire responses contained several inaccuracies and inconsistencies. Her responses reflect a lack of sophistication in matters of legal language and procedure not uncommon among lay persons. Nevertheless, it is apparent from her answers that she had been involved in litigation concerning liens and an alleged breach of contract. Cernik's obvious confusion, evident from her juxtaposition of references to liens on her property and a breach of contract claim against a builder, should have alerted counsel to the need for additional inquiry. Village's attorney did not, however, avail himself of that opportunity, choosing rather to ask several leading questions and, on one occasion, to interrupt Cernik and supply an answer for her.

In *Williams,* the supreme court pointed out that narrowly-focused voir dire questions often result in narrowly-focused answers. 736 S.W.2d at 37. To that we would add that leading questions often yield "led answers." Moreover, the *Williams* court pointed out the responsibility of counsel to pursue issues on voir dire. *Id.* at 38. Such a pursuit is lacking here.

We are not convinced that Cernik's voir dire responses constituted nondisclosure. Her nondisclosure, if any, certainly pales when compared to that of the "forgetful juror" in *Williams,* 736 S.W.2d at 38. That Cernik did not reveal on voir dire the entire account of her involvement in the Frese and Morgan Wightman litigation appears to us to be the result of the manner in which the examination was conducted. As a result, we do not believe the first prong of the two-part *Williams* inquiry is satisfied.

Whether nondisclosure is intentional or unintentional is a determination left to the sound discretion of the trial court, its ruling to be disturbed only on a showing of abuse of that discretion. *Williams,* 736 S.W.2d at 36. Based on the record before us, we hold the trial court did not abuse its discretion in finding Cernik's nondisclosure, if any, and any inaccuracies in her disclosure, were unintentional.

Having concluded Cernik's nondisclosure, if indeed there was any, was unintentional, we now look to what the supreme court says about unintentional nondisclosure. The *Williams* opinion sets out these three examples of unintentional nondisclosure:

   the forgotten experience was insignificant;

   the forgotten experience was remote in time;

   the prospective juror reasonably misunderstood the question.

*Id.* at 36. It is obvious from the court's use of the phrase *for example* that this is not an exclusive list which sets forth a definition of unintentional nondisclosure. Indeed, the *Williams* court describes another example of unintentional nondisclosure, one in which the attorneys direct the focus of the questions and answers and fail to pursue matters raised by a prospective juror's responses. The case before us appears to be close kin to the type of unintentional nondisclosure described in *Williams.*

Unintentional nondisclosure of information by a prospective juror does not always require a new trial. The relevant inquiry becomes whether, under the circumstances, the juror's presence on the jury did or may have influenced the verdict so as to prejudice the party seeking a new

trial. *Williams,* 736 S.W.2d at 37. The determination of prejudice is one of fact for the trial court, its finding to be disturbed on appeal only for abuse of discretion. *Id.*

■ Village has not met its burden to show bias on the part of Cernik. *See Williams,* 736 S.W.2d at 37. Cernik's voir dire answers reveal that she was a property owner, as was Village, who had a dispute with a builder, as did Village. It is not surprising that it was Midwest that sought to strike Cernik for cause. The information that came out at the post-trial hearing did nothing to dispel the notion that the logical predilection of Cernik would be to favor Village, a fellow realty owner involved in a dispute with a contractor.

■ Village points to other alleged trial court error: it did not explain its conclusion that Cernik's alleged nondisclosure was unintentional; it did not find a lack of bias on the part of Cernik and a lack of prejudice resulting from Cernik's purported unintentional nondisclosure; it should have permitted Village to file a supplemental memorandum in support of its new trial motion.

All three claims are without merit. On the matter of the trial court's lack of explanation, *Anderson v. Burlington N. RR,* 651 S.W.2d 176 (Mo.App.1983), cited by Village, states no requirement at page 180 that trial courts explain their findings that juror nondisclosure is intentional or unintentional. Concerning the absence of a finding of lack of bias and prejudice, we believe such finding is implicit in the trial court's overruling of the new trial motion. We note the trial court in *Williams* made no express ruling on bias. *See* 736 S.W.2d at 37.

■ Nor did the trial court abuse its discretion in not permitting Village to file a

memorandum after the transcript of the voir dire examination became available. Much of Village's discussion under this point relied on consists of a comparison of Cernik's voir dire responses and her answers to questions at the post-trial hearing and an argument that the inconsistencies prove her intentional nondisclosure. We have reviewed the transcript of voir dire and post-trial hearing testimony and considered Village's forceful argument. Given our conclusion that Cernik responded to voir dire questions as asked and additional information would have been forthcoming had counsel pursued matters raised by her answers, we fail to see how a supplemental memorandum and a transcript of the voir dire examination would have caused the trial court to have concluded Cernik was guilty of intentional nondisclosure. Point Nine is denied.[5]

Judgment affirmed.

FLANIGAN, C.J., and HOGAN, J., concur.

---

5. Cernik's failure to disclose on voir dire that she was at one time a party to a dissolution action is irrelevant in light of Midwest's counsel's statement, "And let's exclude from this question divorce cases." Any nondisclosure claims related to Cernik's dissolution action are without merit and deserve no more than footnote treatment. *See Williams,* 736 S.W.2d at 35–36 n. 3. We accord the same treatment to her failure on the juror questionnaire to dis-

close her involvement in prior litigation. Assuming her nondisclosure on the questionnaire was intentional, the *per se* rule of *Williams,* 736 S.W.2d at 37, would not apply. *Williams* concerns intentional nondisclosure on voir dire, not in an unsworn questionnaire. Moreover, any prejudice to Village that might have occurred as a result of Cernik's incorrect response on the questionnaire was cured by her disclosure at voir dire.